IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **APM TERMINALS MOBILE, LLC,** )<br>)<br>*Plaintiff,*  )<br>)<br>v.  )<br>)<br>**INTERNATIONAL** )<br>**LONGSHOREMEN'S** )<br>**ASSOCIATION, AFL-CIO, LOCAL** )<br>**UNION 1410** )<br>)<br>*Defendants.* | **CASE NO. 1-23-CV-00332-C** |

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiff APM Terminals Mobile, LLC ("APM" or "Plaintiff"), pursuant to Rules 8 and 57 of the Federal Rules of Civil Procedure, hereby files its Amended Complaint contemporaneously with its supporting evidentiary materials and alleges as follows:

## PARTIES

1. APM is a foreign limited liability company qualified to do business in Alabama. APM is engaged in stevedoring and marine terminal operations related exclusively to the loading and discharge of containerized cargo in the Port of Mobile ("the Port") in Mobile County, Alabama.

2. Defendant International Longshoremen's Association, AFL-CIO, Local Union 1410 ("Local 1410" or "Defendant") is a local union affiliated with the

Classification: Confidential

International Longshoremen's Association, AFL-CIO ("ILA") that represents longshore employees who perform work for APM moving cargo around APM's facility, including via trucks going to and from the rail facility at the Port.[1]

3. APM relies heavily on Local 1410 to ensure the uninterrupted movement of cargo coming in and out of the Port. Without an adequate number of drivers and at least one hatch tender or "pin man," the rail cargo operations at APM's terminal come to a halt.[2]

4. APM's terminal operates similar to an airport, and the containers coming in and out of the Port move through the terminal like airline passengers. If a container is not unloaded from the train and loaded onto the vessel on time, much like an airline passenger making a connecting flight, the container will miss its scheduled departure.

5. Thus, the timely transporting of cargo containers is critical to APM's operations. Even a slight delay has a domino effect, creating a backlog of cargo,

---

[1] Local 1410 is comprised mostly of drivers (67 in total) who transport shipping containers loaded with cargo around APM's facility, including to and from the rail facility. Transporting the cargo between the main terminal and the rail requires the drivers to travel on city roads and, therefore, they are required to have a valid commercial driver's license ("CDL"). The rail cargo operations performed by Local 1410 require multiple drivers, and the number fluctuates depending on the job. On average, a typical job requires nine (9) to ten (10) drivers.

[2] The hatch tender aka "pin man" is responsible for locking and unlocking the stacking cones that secure the first and second tier of containers loaded onto the trucks.

trains waiting to be unloaded, and vessels waiting to be loaded with cargo, and vice versa. The delays in moving cargo caused by a work stoppage quickly result in a backlog of cargo on terminal, and if a work stoppage persists, it affects and eventually can shut down the entire Port.

6.  Moreover, the cargo arriving by train is coming from inland locations like the Midwest to be loaded onto vessels for export. When the cargo containers cannot be unloaded from the train and transported by the Local 1410 CDL drivers for loading onto the vessels as scheduled, the cargo misses its scheduled departure, is rolled over to the next week for shipping further congesting the terminal. These type of delays result in missed delivery deadlines and increased costs, negatively affect APM, APM's customers and in turn, their customers.

7.  As discussed further below, all of the work Local 1410 performs for APM is covered under a collective bargaining agreement.

## JURISDICTION AND VENUE

8.  This action was originally filed in the Circuit Court of Mobile County, Alabama. On August 30, 2023, Local 1410 removed this action to the United States District Court for the Southern District of Alabama under 28 U.S.C. § 1331 on the grounds that APM's claims arise out of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). (Doc. 1, PageID ## 1 – 2). APM agrees that Local 1410 has properly invoked the jurisdiction of this Court and that jurisdiction

3

is otherwise proper because APM seeks a declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

9. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the actions or inactions giving rise to this controversy occurred in Mobile County, Alabama.

## FACTUAL ALLEGATIONS

### A. The Collective Bargaining Agreement

10. On April 27, 2020, APM and Local 1410 agreed on a local collective bargaining agreement (the "Local CBA"), which is currently in effect and does not expire until September 30, 2024. (Local CBA, attached hereto as "**Exhibit 1**").

11. The Local CBA includes a "**NO STRIKE OR LOCKOUT**" provision ("no-strike provision") that provides in relevant part as follows:

### NO STRIKE OR LOCKOUT

> During the term of this Agreement, . . . Local 1410 agrees that there shall be no strike, sympathy strike, sit down, walkout, suspension of work, curtailment or limitation of production, slowdown, picketing, or any other total or partial interference with or stoppage of [APM's] operations for any cause whatsoever, including without limitation any alleged unfair labor practices by [APM] or any alleged violations of this Agreement by [APM].
>
> In the event of strike or other action proscribed above, the Union shall immediately take affirmative action allowed by law in an effort to prevent or terminate such violation of this Agreement.

(Ex. 1 at p. 2, Art. 4)

12. All of the members of Local 1410 who perform work for APM are subject to the no-strike provision, which expressly requires Local 1410 to take "affirmative action" to prevent or terminate any violations of the no-strike provision.

13. Further, the no-strike provision authorizes APM to seek immediate injunctive and declaratory relief if the provision is violated. (Ex. 1 at pp. 2 – 3).

14. Additionally, the no-strike provision expressly contemplates and permits "*judicial…action against [Local 1410] for damages*" if notice of the violation of the no-strike provision has been provided and Local 1410 fails to take "affirmative action" to remedy it. (Ex. 1 at pp. 2 – 3) (emphasis added).

15. With the exception of the remedies outlined above, *which apply only to the no-strike provision*, the Local CBA provides that all other disputes Local 1410 or its members may have against APM based on alleged violations of the Local CBA are subject to the "**DISPUTES AND ARBITRATION**" provision ("grievance and arbitration provision"). (Ex. 1 at pp. 3 – 6, Art. 5).

16. Accordingly, disputes related to safety concerns, the work jurisdiction of the various local unions performing work at APM, discipline, and all other work-related disputes between APM and Local 1410 not arising under the no-strike provision must be resolved according to the mandatory grievance and arbitration provision.

    **B.**     **Local 1410's Unauthorized Work Stoppage**

17. Prior to the events giving rise to APM's Complaint, Local 1410 raised concerns about alleged work jurisdiction violations, claiming another local union was performing work (moving containers) that is within the exclusive jurisdiction of Local 1410.

18. In fact, prior to the filing of APM's Complaint in the state court, Local 1410 filed numerous grievances based on the alleged jurisdiction dispute, and the grievances were pending on August 28, 2023. As mentioned above, pursuant to the Local CBA, concerns or disputes about alleged work jurisdiction violations must proceed under the mandatory grievance and arbitration provision and do not permit or excuse a work stoppage or other strike activity.

19. Notwithstanding the Local CBA's strict prohibition against strike activity, on the morning of August 28, 2023, APM overheard one of the Local 1410 drivers directing other Local 1410 members via two-way radio to stop working *due to the work jurisdiction dispute with the other union*, and all Local 1410 members did immediately stop work upon hearing such direction.

20. Specifically, shortly after the morning safety discussion lead by APM's Assistant Operations Managers, one of the Local 1410 drivers used the two-way radio, which is recorded for business purposes, to direct "all CDL drivers" to "pull over" and stop working. In response, one of the Assistant Operations Managers asked, "[w]hy are we [Local 1410 drivers] stopping?" In reply, the driver who gave

the stop-work directive stated that he saw what he perceived to be a violation of Local 1410's work jurisdiction because another local union was "moving boxes from the train to the pile and the pile to the train."

21. Following this exchange, the Assistant Operations Manager immediately instructed all drivers to return to work and explained, "what's going on as far as moving containers is well above my pay grade and is something to be discussed between Mark Bass [Local 1410 President] and our [APM's] labor relations representative." He further instructed that any drivers who refused to return to work were "fired for the day" and could park their trucks.

22. Local 1410 members refused APM's request to resume working, and by approximately 9:00 A.M. on August 28, 2023, the members of Local 1410 had stopped all work.

23. As provided in the no-strike provision, employees who engage in conduct that violates the no-strike provision are subject to immediate disciplinary action, including suspension from work and/or the eligibility for hire. Accordingly, when the Local 1410 drivers refused to resume work on August 28, 2023, APM instructed them to park their trucks and leave. In total, ten (10) members of Local 1410 were sent home as "fired for the day" based on their participation in the unauthorized work stoppage.

7

### C.    APM's Response to Local 1410's Unlawful Work Stoppage

24.    In response to the work stoppage, and as expressly authorized by the no-strike provision of the CBA, APM filed for injunctive relief in the Circuit Court of Mobile County, including a verified application seeking a temporary restraining order ("TRO") to enjoin the work stoppage.

25.    As set forth in the factual allegations above, the delays and disruption to operations caused by Local 1410's work stoppage threatened considerable and irreparable harm to APM.  When cargo cannot be unloaded from the trains due to a lack of qualified drivers, this prevents the cargo from being loaded onto the vessel (and from vessels onto the trains) for shipment to its ultimate destination, resulting in shipping delays and placing APM's customers in jeopardy of missing shipment deadlines.

26.    Additionally, when cargo is backing up at the rail station due to a lack of drivers, this postpones the trains from returning to APM's rail shipping customer, which owns and operates the trains.  This results in a shortage of rail cars available for use by APM's rail shipping customer, placing the customer at risk for breaching its contractual obligations and causing the customer to incur financial losses that the customer expects APM to reimburse.

27.    After APM filed its request for a TRO and supporting evidentiary materials, the state court held a hearing during which APM presented oral argument

demonstrating the irreparable harm caused by Local 1410's work stoppage and a substantial likelihood of success on the merits based on the clear and unequivocal language of the no-strike provision.

28.   On the morning of August 29, 2023, the state court granted APM's verified application and issued the TRO, enjoining Local 1410 from further work stoppages, including from permitting or encouraging its members to continue participating in the work stoppage. (*See* Aug. 29, 2023 TRO, attached hereto as "**Exhibit 2**").

29.   The TRO also directed Local 1410's leadership, including its President, Mark Bass ("Mr. Bass"), to immediately instruct Local 1410 members to resume and "shape-up" for work and required Mr. Bass to exercise all of his authority to ensure compliance with the TRO and prevent further disruption to APM's operations.

30.   The TRO was issued on August 29, 2023 at 10:08 A.M. Immediately thereafter, at 11:13 A.M., the undersigned counsel delivered a certified copy of the TRO to Mr. Bass. Additionally, APM's Director of Labor Relations wrote Mr. Bass to confirm, "APM's expectation that [he] fully comply with the TRO and take any steps necessary to ensure the members of Local 1410 comply with the TRO." (Aug. 29, 2023 email from Ms. McClurkin and Aug. 29, 2023 letter from Ms. Robertson delivered via email, attached hereto collectively as "**Exhibit 3**").

31. On information and belief, Mr. Bass either disregarded the requirements of the TRO, or alternatively, failed to make a good faith effort to comply with its requirements, which prolonged the work stoppage.

32. In furtherance of APM's efforts to return the members of Local 1410 to work, on the afternoon of August 29, 2023, APM sent a labor order for ten (10) drivers and one (1) pin man needed for the following day's job, which was scheduled to begin at 7:00 A.M. on August 30, 2023.

33. At approximately 3:38 P.M. on August 29, 2023, the labor order was confirmed.

34. However, on the morning of August 30, 2023, none of the Local 1410 members showed up for work, and the job scheduled to begin at 7:00 A.M. had to be postponed.

35. In an effort to avoid derailing a third consecutive workday due to the work stoppage, APM adjusted the scheduled start time for the job, pushing it back to 1:00 P.M., and immediately began working to try and secure enough Local 1410 members to perform the work scheduled to be completed on August 30.

36. APM contacted the hiring delegate, and eventually Mr. Bass, to discuss the ongoing work stoppage and try to resolve the issue so that operations could return to normal. Receiving little to no help from Mr. Bass, APM management began directly contacting the list of 67 eligible CDL drivers (excluding those involved in

the work stoppage) to inform them of the TRO and ask that they immediately report to work.

37. Despite APM's considerable efforts, only one (1) pinman and three (3) of the ten (10) drivers needed for the job on August 30 reported to work on the afternoon of August 30, once again preventing and disrupting normal operations.

38. Contrary to the mandates of the TRO entered on the morning of August 29, 2023, it was not until August 31, 2023 when an adequate number of Local 1410 drivers shaped up for work so that operations finally could resume at normal capacity.

### D. Mr. Bass's Attempted Justification of Local 1410's Violation of the No-Strike Provision

39. Prior to Local 1410 returning to work and while the unlawful work stoppage continued *even after the TRO was entered*, Mr. Bass provided statements to the media denying that any work stoppage occurred on the morning of August 28, 2023. Indeed, according to Mr. Bass, the union members involved merely "attempted to raise a safety concern to APM management on Monday," and the events that day were the result of legitimate concerns over "jurisdiction" and "safety" issues. (Aug. 29, 2023 Lagniappe article and Aug. 30, 2023 AL.com article, attached hereto collectively as "**Exhibit 4**").

40. Similarly, in an after-the-fact attempt to lend credibility to his attempted justification of the work stoppage based on safety concerns, also on August 29, 2023,

11

Mr. Bass filed an OSHA complaint claiming unsafe working conditions at APM's rail facility. (*See* Aug. 29, 2023 OSHA letter, attached hereto as "**Exhibit 5**").

41. Mr. Bass's retroactive characterization of the work stoppage as a purported dispute about safety is a gross misrepresentation and otherwise unavailing.

42. For starters, Mr. Bass's characterization is patently false. The Local 1410 members involved in the work stoppage never raised any alleged safety concern prior to stopping work on the morning of August 28, 2023. That is true despite irrefutable evidence establishing that less than five (5) minutes before the work stoppage began, APM's Assistant Operations Managers explicitly asked the members of Local 1410 during the daily morning safety discussion if there were any questions or concerns about safety to address prior to starting work.[3] None of the Local 1410 members responded in any fashion, much less mention the alleged safety concern Mr. Bass told the media was the reason Local 1410 members initiated the work stoppage on August 28.

43. To elaborate, APM's Assistant Operations Managers routinely conduct morning safety discussions via two-way radio that are heard by all of the Local 1410 members who are at work on a given day. In accordance with the managers' normal

---

[3] As already discussed, communications via APM's two-way radio are recorded pursuant to normal business practices, and all of the statements referenced herein as made via the two-way radio, including the Local 1410 driver's stop-work directive due to a work jurisdiction dispute, were recorded and have been preserved.

practice, on the morning of August 28, the manager leading the morning safety discussion concluded, "[t]hat's all I've got this morning. Has anyone got any questions about safety or operations?" As mentioned, none of the Local 1410 members responded. Hearing no response, the manager finished his announcement by stating, "[o]kay, if there are no questions about safety or operations then … we can go ahead and get started." Once again, none of the Local 1410 members voiced any question or concern related to safety prior to beginning work that morning, albeit only for a very brief time until one of the Local 1410 drivers directed other members to "stop work" based on the alleged work jurisdiction issue, not an alleged safety issue. (*See* discussion, *supra* at ¶¶ 15-17)

44. Moreover, even if the Local 1410 members had expressed a safety concern (they did not), that would not permit a work stoppage or excuse the prohibited strike activity pursuant to the clear and express terms of the Local CBA. The same is true for a work jurisdiction dispute, and both disputes are subject to the mandatory grievance and arbitration provision under the Local CBA.

   **E. The Aftermath of the Unlawful Work Stoppage and Impact on APM**

45. The work stoppage that began on the morning of August 28, 2023 and continued, at least in large part, through August 30, 2023 caused APM to suffer significant losses, some that can adequately be addressed by monetary damages and some that cannot. The losses that reasonably can be remedied through monetary

damages include, but are not limited to: rail revenue, terminal rail revenue, fees owed to third-parties due to the delays, labor costs to mitigate the work stoppage delays, and other miscellaneous expenses, including APM's reasonable attorney's fees and legal expenses.

46. APM's calculations of its monetary damages from the work stoppage are ongoing, but based on a conservative estimate, are believed to exceed $120,000, excluding attorneys' fees and expenses.

47. APM also has incurred and continues to incur reasonable attorneys' fees and expenses as a result of Local 1410's violations of the no-strike provision and subsequently, the TRO.

48. However, as mentioned, certain losses caused by the work stoppage are irreparable in nature because they are difficult, if not impossible, to ascertain and cannot adequately be addressed by monetary damages. These include reputational harm to APM's existing and prospective business and customer relationships, the full extent of which is unknown and may never fully be known due to the nature of such injuries.

49. Further, APM's injuries were exacerbated by Local 1410's efforts, and specifically Mr. Bass's, to publicize and misstate the events of the work stoppage by making misleading statements to the media and filing disingenuous administrative claims, including to OSHA. (*See, supra*, at ¶ 6; Ex. 4).

50. The media attention and Mr. Bass's public mischaracterization of the reasons for the work stoppage only increased the risk of public apprehension concerning the apparent labor unrest at APM's terminal. Not surprisingly, shipping and logistics companies have the ability to and will steer business away from terminals operated by employers who cannot effectively manage labor disputes to avoid disruptions, delays, and potentially a shutdown. These are precisely the type of irreparable injuries the no-strike provision was intended to prevent, and are what persuaded the Honorable Ben H. Brooks presiding in the Circuit Court of Mobile County, to enter the TRO.

## Count I: Declaratory Judgment

51. APM adopts and incorporates the allegations in paragraphs 1 – 50 above as if fully set forth herein.

52. APM seeks declaratory relief, adjudicating the rights and obligations of the parties hereto.

53. As demonstrated by the factual allegations above, a real, bona fide controversy exists between the parties with regard to: (i) whether the events on August 28, 2023 violated the no-strike clause; (ii) whether the work stoppage that continued through the end of the workday on August 30, 2023 after the TRO was entered violated the no-strike provision and the TRO; and (iii) whether the alleged

justifications for the work stoppage offered by Local 1410 permit or excuse the work stoppage.

54. Based on the foregoing, Plaintiff requests a declaratory judgment in its favor finding and instructing as follows:

(a) Defendant's actions on August 28, 2023 violated the terms of the no-strike provision in the Local CBA;

(b) Defendant's actions and/or inactions after receiving notice of the TRO on the morning of August 29, 2023 and continuing through the end of the work day on August 30, 2023 violated the no-strike provision and/or the mandates of the TRO;

(c) Defendant's alleged justifications – whether based on alleged safety, work jurisdiction, or any other alleged work-related disputes or concerns, do not excuse Local 1410's work stoppage on August 28, 2023 and/or for the remainder of the period the no-strike provision in the Local CBA remains in effect; and

(d) Plaintiff shall be awarded its reasonable attorneys' fees and expenses incurred as a result of the work stoppage and violation of the TRO, in addition to any such other, further, or different declaratory relief to which Plaintiff may be entitled.

## Count II: Breach of the No-Strike Provision

55. Plaintiff adopts and incorporates the allegations in paragraphs 1 – 54 above as if fully set forth herein.

56. Plaintiff and Defendant entered into the Local CBA on April 27, 2020, which was in effect throughout the work stoppage on August 28 – 30, 2023.

57. Defendant breached the no-strike provision of the Local CBA by engaging in, ordering, authorizing, permitting, inducing, and/or encouraging

members of Local 1410 to stop working on August 28, 2023 and continuing through the end of the workday on August 30, 2023.

58. Further, after APM notified Mr. Bass of the breach and even after it notified him of the TRO, rather than taking "affirmative action" to discontinue the work stoppage and return Local 1410 members to work, Mr. Bass spent his time and efforts denying, mischaracterizing, and attempting to excuse or justify the work stoppage – all in violation of the no-strike provision and requirements of the TRO.

59. As a result of Defendant's work stoppage and the aftermath that followed, APM suffered significant financial and other losses, including but not limited to lost: rail revenue, terminal rail revenue, fees owed to third-parties due to the delays, labor costs to mitigate the work stoppage delays, other miscellaneous expenses, including reasonable attorneys' fees and legal costs.

60. Each of the conditions precedent for instituting judicial action to recover monetary damages under the no-strike provision has been satisfied.

Based on the foregoing, Plaintiff demands judgment against Defendant for compensatory damages, including reasonable attorneys' fees and expenses, and any such other, further, or different relief to which it may be entitled.

Respectfully submitted this the 21st day of November 2023,

*/s/ Anne Laurie McClurkin*
Anne Laurie McClurkin (MCCLA2262)
Maynard Nexsen
RSA Battle House Tower
11 North Water Street, Suite 24290
Mobile, Alabama 36602
(t) 251.432.0001
amcclurkin@maynardnexsen.com

**Attorney for Plaintiff APM Terminals Mobile, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 21st day of November 2023, electronically filed the foregoing, using the court's electronic filing system, which automatically will send notification to all counsel of record.

*/s/ Anne Laurie McClurkin*